**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PATRICK BERNARD,

    Plaintiff,

    v.

ILLINOIS DEPARTMENT OF FINANCIAL
AND PROFESSIONAL REGULATION,

    Defendant.

JURY TRIAL DEMANDED

<u>**COMPLAINT**</u>

Plaintiff, Patrick Bernard, by his attorneys Equip for Equality, brings this action against the Illinois Department of Financial and Professional Regulation, as follows:

**INTRODUCTION**

1.    This is a case about a reasonable accommodation for a disability that was senselessly ripped away after working successfully for four years, and the interference and retaliation that followed the employee's attempts to restore it.

2.    Starting in 2014, Plaintiff Patrick Bernard worked as an attorney for the Illinois Department of Financial and Professional Regulation ("the IDFPR"). Due to a spinal cord injury, Mr. Bernard experiences limited mobility and difficulties with muscle control. Exposure to extremely cold weather worsens his muscle spasticity and decreases his mobility, leaving him unable to walk with a cane or to use a wheelchair safely.

3.    From 2014 to 2017, the IDFPR accommodated Mr. Bernard's disability by allowing him to work remotely on occasional days where severe winter weather made it unsafe for him to leave his home. (This accommodation is also known as "work-from-home," "work-at-

home," and "telework"; we use "remote work" here.) Mr. Bernard could perform all the essential functions of his position with this accommodation.

4.     But in 2018 the IDFPR abruptly ended Mr. Bernard's accommodation, failed to provide him with an effective alternative, and retaliated against him and interfered with his exercise of statutory rights. By endangering his health, it constructively discharged Mr. Bernard.

5.     This action is brought by Mr. Bernard to redress violations of his rights by IDFPR under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq*., and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

7.     Venue is proper under 28 U.S.C. § 1391(b) because Defendant conducts business and the events occurred in this district and 42 U.S.C. § 2000e-5(f)(3) (adopted by 42 U.S.C. § 12117) because the unlawful employment practice was allegedly committed in this district.

8.     Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 16, 2018. The Plaintiff's Charge of Discrimination is attached as Exhibit A.

9.     The EEOC issued a determination finding reasonable cause that Defendant violated Mr. Bernard's rights under the ADA. The EEOC's determination is attached as Exhibit B.

10.     Defendant declined to take part in conciliation, and on August 24, 2021, the EEOC issued Plaintiff a Notice of Right to Sue. The Notice of Right to Sue is attached as Exhibit C. This Complaint is being filed within the 90-day requirement from the issuance of the Notice of Right to Sue.

## PARTIES

11.　　Plaintiff Patrick Bernard worked and resides in Chicago, Cook County, Illinois.

12.　　Defendant Illinois Department of Financial and Professional Regulation is an Illinois state agency responsible for regulating financial institutions and professional licensure. It maintains offices in Chicago, Cook County, Illinois.

## FACTS

**A.　　Plaintiff Patrick Bernard's Disability**

13.　　Mr. Bernard worked as an attorney in the Real Estate Prosecutions Division of the IDFPR from January 2014 to January 2020.

14.　　Most of Mr. Bernard's work in the Real Estate Prosecutions Division consisted of drafting documents at his computer, reviewing case files, and communicating about cases via phone or email. Very occasionally, Mr. Bernard attended formal hearings or informal conferences.

15.　　Since 2011, Mr. Bernard's mobility has been limited due to a spinal cord injury. His injury causes diminished strength and muscle control in all areas below his shoulders and, as a result, he walks with a cane or uses a wheelchair.

16.　　Extremely cold weather worsens the muscle spasticity caused by Mr. Bernard's injury, further decreasing his mobility and making it dangerous for him to go outside. In such conditions, Mr. Bernard cannot walk or safely use a wheelchair.

17.　　It is also dangerous for Mr. Bernard to walk or travel by wheelchair or with a cane over heavily snowy or icy terrain, meaning that he cannot safely leave home on days where there is significant uncleared snow or ice on the streets.

**B.      IDFPR Gives A Reasonable Accommodation for Four Years (2014–17)**

18.      From 2014 to 2017, the IDFPR permitted Mr. Bernard to work remotely on days where the weather made it dangerous for him to leave home. This accommodation allowed Mr. Bernard to perform the essential functions of his position. Almost all the functions of Mr. Bernard's position, such as reviewing files and drafting documents, could be and were performed remotely on the occasional days that he had to be away from the office due to weather.

19.      In the four years that Mr. Bernard had this accommodation, it did not interfere with his attendance at hearings or conferences. During his final full cold-weather season with the IDFPR, October 2018 until March 2019, he was only scheduled for six days of formal hearings and one day of informal conferences. In the same period there were only five-and-a-half days of severe winter weather as defined by his doctor. These days did not overlap. This was reflective of a typical winter. In the rare event that a severe winter weather day might coincide with a hearing, such hearings could be rescheduled.

20.      As further evidence that the remote-work option was feasible, all of Mr. Bernard's supervisors were permitted to, and did, work remotely regularly. In addition to their supervisory duties, supervisors in the Real Estate Prosecutions Unit had a caseload and shared all the same job duties as Mr. Bernard, including attendance at hearings and conferences.

21.      There were no complaints about Mr. Bernard not being able to perform his job.

**C.      IDFPR Takes Away Plaintiff's Reasonable Accommodation (2018)**

22.      On January 2, 2018, Mr. Bernard informed his supervisor Teresa Molina that the extremely low temperature that day (-9°F) would make it dangerous for him to come into the office and, as Mr. Bernard always had, requested approval to work remotely as an accommodation.

4

23.     Ms. Molina approved the request but suggested that they contact Human Resources to formalize the accommodation of remote work in the event of severe winter weather.

24.     The very next day, January 3, 2018, Ms. Molina informed Mr. Bernard that Human Resources decided he would not be permitted to work remotely under any circumstances.

25.     Mr. Bernard, aware that the ADA requires employers to make an individualized determination about what accommodations may be available for an employee, requested a meeting with Human Resources to start an interactive process to determine a reasonable accommodation.

26.     On January 9, 2018, Mr. Bernard met with the IDFPR's ADA Coordinator, Lorenzo Roberson, to discuss his need for a reasonable accommodation.

27.     At the meeting, Mr. Roberson insisted that remote work was not a reasonable accommodation under the ADA and brushed-off Mr. Bernard's attempt to show him the EEOC guidance on work-at-home/telework (EEOC, *Work at Home/Telework as a Reasonable Accommodation*, 29 C.F.R. Part 1630, https://www.eeoc.gov/laws/guidance/work-hometelework-reasonable-accommodation). Mr. Roberson also misdescribed the nature of Mr. Bernard's position, claiming (incorrectly) that Mr. Bernard could not perform his role if he worked remotely on days of severe winter weather. Despite that attending formal hearings makes up a very small portion of Mr. Bernard's job, Mr. Roberson asserted that, as a prosecutor, Mr. Bernard needed to be in the office "to prosecute." When Mr. Bernard asked Mr. Roberson to explain what he believed "prosecuting" meant for a Real Estate Unit prosecutor, Mr. Roberson did not elaborate.

28.     On or around January 11, 2018, Mr. Bernard submitted a formal request to work remotely on days of severe winter weather, i.e., where the temperature was lower than 5°F or where conditions on the streets were dangerously poor due to snow and ice.

29.      Mr. Bernard at the same time, and unrelated to the severe winter weather accommodation, requested to work remotely for two weeks following an upcoming surgery scheduled for January 25, 2018. This accommodation was necessary because Mr. Bernard would be unable to walk or to use a wheelchair for two weeks while he recovered from surgery.

30.      On January 19, 2018, Mr. Bernard met with Mr. Roberson and Ms. Molina to discuss his accommodation requests.

31.      During the meeting, Mr. Roberson continued to say that Mr. Bernard could not perform his job remotely, again asserting that Mr. Bernard had to be in the office to "prosecute."

32.      Mr. Bernard tried to counter Mr. Roberson's incorrect assumptions about the nature of his position by giving a description of his job and explaining that much of his daily work consisted of drafting documents at his computer. He also pointed out that he had successfully performed his position with this exact same accommodation for several years.

33.      Mr. Roberson did not heed Mr. Bernard's description or seek out clarifying information about the nature of Mr. Bernard's role and whether it could be performed remotely.

34.      At the end of the January 19 meeting, Mr. Roberson orally informed Mr. Bernard that his request to work remotely during severe winter weather was denied, although his request to work remotely for two weeks following surgery would be granted.

35.      When Mr. Bernard inquired about whether there were any alternative accommodations that might be available for days of severe weather, Mr. Roberson informed him that he could use intermittent Family and Medical Leave Act ("FMLA") time.

36.      This suggested alternative, requiring Mr. Bernard to take *unpaid* FMLA leave when he had work that could otherwise be done remotely, would be neither reasonable nor effective. Additionally, because this proposed accommodation would leave Mr. Bernard unable to work at

all during severe winter weather, it is inconsistent with the IDFPR's avowed concern that Mr. Bernard might miss hearings or conferences if he worked remotely on those days.

37.     The IDFPR had not followed its own accommodation request procedures when deciding Mr. Bernard's request. The IDFPR had not requested a written recommendation on the matter from Mr. Bernard's supervisor, had not asked for a recommendation from Mr. Bernard's Division Manager, and had not convened an ADA committee.

38.     Pursuant to the IDFPR's accommodation request procedures, Mr. Bernard was also supposed to receive a written decision within 30 days of filing his request for an accommodation.

39.     By January 24, 2018, the day before he was scheduled for surgery, Mr. Bernard still had not received the written decision on his accommodations. When he asked Mr. Roberson about this, Mr. Roberson said it was being drafted.

**D.     Difficulties with Plaintiff's Remote Work Accommodation After Surgery (2018)**

40.     On January 25, 2018, Mr. Bernard underwent a spinal cord surgery. There were unexpected complications from the surgery, causing Mr. Bernard to be hospitalized until March 22, 2018. While in the hospital, Mr. Bernard took FMLA leave.

41.     Mr. Bernard kept his supervisor, Ms. Molina, apprised of his condition while he was hospitalized. He also informed her that upon his discharge from the hospital he intended to work remotely for two weeks in accordance with the accommodation he was orally granted on January 19. Ms. Molina never said that this would be an issue, nor did she inform Mr. Bernard that he might need additional documentation to return to work.

42.     On March 8, 2018, Mr. Bernard's doctor sent a letter to the IDFPR stating that he would be able to return to work on March 26, 2018.

43.     On March 21, 2018, shortly before his discharge from the hospital, Mr. Bernard realized that he still had not received a written accommodation decision. He emailed Mr. Roberson.

44.     In his response to this email, Mr. Roberson informed Mr. Bernard that he would be required to submit additional documentation to return to work in any capacity and that if he wished to work remotely he would need a doctor's note.

45.     On March 22, 2018, a few hours after his discharge from the hospital, Mr. Bernard received a letter from Mr. Roberson notifying him that he had only been granted the accommodation of remote work for the one week following his scheduled surgery date of January 25, 2018. The letter further stated that if Mr. Barnard was intending to work remotely following his release from the hospital, he would need to submit updated medical documentation.

46.     On March 23, 2018, Mr. Bernard met with Mr. Roberson and Ms. Molina by phone to discuss what documentation Mr. Bernard would need to return to work.

47.     At the meeting, Mr. Bernard asked why Ms. Molina had not informed him that he would need additional medical documentation while he was still in the hospital and could more easily work with his doctors to obtain the necessary documentation. She declined to answer.

48.     Also at the meeting, Mr. Roberson told Mr. Bernard that he would need to submit a new letter from his doctor regarding the accommodations he would need to return to work.

49.     Mr. Roberson did not mention any other forms, and Mr. Bernard was given the impression that this doctor's letter was all that was required to return to work.

50.     Shortly after the meeting, Mr. Bernard sent Mr. Roberson an email to recap the meeting and to seek confirmation of his understanding of what documentation was required.

51.     Mr. Roberson replied to Mr. Bernard's email, stating that the documentation would need to include a description of all his functional limitations. Mr. Roberson's reply did not specify that Mr. Bernard would need to submit this information in any specific format.

52.     What Mr. Bernard did not know, because Mr. Roberson had failed to tell him, was that under the agency's procedures he needed to submit a specific form, called a CMS 95, in addition to the letter regarding accommodations.

53.     Mr. Bernard worked with his doctor to obtain a letter indicating his ability to return to work and submitted it to the IDFPR.

54.     On April 9, 2018, Mr. Bernard was informed that the doctor's letter he submitted was insufficient to allow him to return to work, though he was not told why it was insufficient.

55.     On April 11, 2018, Mr. Bernard finally learned that he needed to submit a CMS 95 form. His doctor completed the form, and he was told he could return to work on April 13, 2018.

56.     Due to Mr. Roberson's unclear statements about what documentation was required for Mr. Bernard to return to work, Mr. Bernard was not permitted to work at all from March 26, 2018 (the day his doctor had cleared him to return to work remotely) to April 13, 2018 (the day that IDFPR finally allowed him to return to work in the office).

57.     During the weeks when he was not allowed to work, Mr. Bernard experienced severe distress as he tried desperately to figure out what he needed to do to be allowed to return. His anxiety over the situation was so great that he was unable to sleep.

**E.     Final Decision on Reasonable Accommodation for Winter Remote Work (2018)**

58.     During this same time, Mr. Bernard received a formal written decision denying his request to work remotely during severe winter weather.

59.     IDFPR policy states that a written decision on an accommodation request will be provided within 30 days of the request being files. However, the denial letter was dated March 21, 2018, some 70 days from the date that Mr. Bernard submitted his accommodation request.

60.     In the denial letter, Mr. Bernard was offered a modified work schedule as an alternative accommodation to telework on severe winter weather days. Under this modified schedule, Mr. Bernard's work hours would be 9:30am to 6:00pm rather than the standard 8:30am to 5:00pm. The letter suggested that a modified schedule would allow more time for ice and snow to be cleared from the streets and would provide Mr. Bernard with more time to travel to work.

61.     An accommodation allowing Plaintiff to come into the office at 9:30am rather than 8:30am would not address the central issue, which is that it is unsafe for Plaintiff to leave his house in severe winter weather. On such days, conditions would not change significantly enough in one hour (or even several hours) to enable Plaintiff to safely leave his home.

62.     The modified work schedule offered by the IDFPR did not provide a solution for days where an ongoing storm meant that the streets could not be cleared of snow and ice, nor did it accommodate Mr. Bernard's inability to go outside safely on days where the temperature was lower than 5°F.

63.     On April 11, 2018, Mr. Bernard submitted a complaint to the Department's then-General Counsel, Dina Masiello, about Mr. Roberson's failure to follow the Department's ADA procedures or to provide Mr. Bernard with correct, timely information on returning to work following his FMLA leave. He also submitted a request for reconsideration of the denial of his request to work remotely as an accommodation in the event of severe winter weather.

F.     **Failure to Accommodate, Interference and Retaliation on Return to Work (2018–19)**

64.     When Mr. Bernard returned to the office, he endured further failure to accommodate, interference, and retaliation for his protected activities (seeking and appealing adverse determinations from requests for accommodations for the surgery and winter weather).

65.     Prior to January 2018, Mr. Bernard had enjoyed working in the Real Estate Prosecutions Unit. Due to the ongoing retaliation, and interference, though, Mr. Bernard began to feel alienated from the rest of the unit.

66.     On more than one occasion, Mr. Roberson berated Mr. Bernard without cause and threatened him with disciplinary action in front of his coworkers. Mr. Bernard was also not allowed to return to his own office when he came back from surgery. Instead, he was placed in a cubicle in a hallway where his wheelchair barely fit. Conditions were so tight that he had to get out of his wheelchair to retrieve his files. The hallway was so loud that he began wearing headphones to cut down the noise and allow him to concentrate so that he could do his job.

67.     Mr. Bernard required a second spinal cord surgery in August of 2018, and again requested the reasonable accommodation to work remotely for two weeks after the day of the surgery because he would be unable to walk or use a wheelchair during that time.

68.     Mr. Roberson informed Mr. Bernard that, in addition to the pre-surgery documentation he had included in his request, Mr. Bernard would need to submit post-surgery medical documentation before the IDFPR would decide whether Mr. Bernard could work remotely following this surgery. It was not the IDFPR's usual practice to require this sort of post-surgery documentation.

69.     Because of Mr. Roberson's refusal to timely decide his accommodation request, Mr. Bernard had to undergo a stressful surgery while also dealing with the anxiety of not knowing

whether he would be forced to take two weeks of unpaid leave afterward. Moreover, rather than taking time to rest and recover, Mr. Bernard had to spend the hours immediately following his surgery working with his doctors to complete and send medical documentation to the IDFPR.

70. On May 8, 2018, Mr. Bernard received a response regarding the complaint and request for reconsideration that he had submitted to Ms. Masiello on April 11. Mr. Bernard's request for reconsideration was denied, as were all subsequent reasonable accommodation requests to work remotely due to severe winter weather. The IDFPR also declined to provide a remedy for the harms Mr. Bernard had suffered because of Mr. Roberson's misrepresentations and failure to act on his requests.

71. Mr. Bernard considered a transfer to another division within the IDFPR, the Medical Prosecutions Unit, in hopes of finding a less hostile work environment.

72. Mr. Roberson learned of this potential transfer and called a meeting with both Mr. Bernard and the chief of the Medical Prosecutions Unit. At the meeting, Mr. Roberson informed them that if Mr. Bernard transferred to the Medical Prosecutions Unit, he would not receive any accommodations related to severe winter weather, not even the modified schedule that the IDFPR had offered as an alternative accommodation.

73. Because of Mr. Roberson's statements in the meeting, Mr. Bernard rejected the transfer and remained in the Real Estate Prosecutions division.

74. On July 18, 2018, Mr. Bernard filed his EEOC charge.

75. Mr. Bernard eventually felt that conditions at work had become so intolerable that he wanted to resign IDFPR but felt unable to do so because he was still experiencing some health issues related to the two spinal cord surgeries he underwent in 2018. Mr. Bernard was concerned

that he might need another surgery at some point, and in light of this, felt he could not risk starting a new job where he would not have access to any FMLA if further surgery became necessary.

76.     On January 25, 2019, to avoid having to take a day of personal time, Mr. Bernard went in to the office despite dangerous conditions created by snow, ice, and daytime temperatures below five degrees Fahrenheit. These conditions made the metal rims on the wheels of his wheelchair wet and cold. Despite having worn two pairs of gloves, Mr. Bernard developed frostbite on one of his hands from touching the wheels to move his chair on his way home from work.

77.     The frostbite incident made leaving the IDFPR seem even more imperative. However, a new Governor took office in 2019 and the IDFPR administration was undergoing changes as a result. Mr. Bernard was hopeful that the new administration might be open to providing him with a reasonable accommodation.

78.     Mr. Bernard spoke with individuals from IDFPR's new administration about his situation and asked whether the IDFPR could provide him with his requested accommodation of working remotely on severe winter weather days.

79.     Mr. Bernard unfortunately was told that the IDFPR could not provide him with an accommodation because he had already filed an EEOC charge. According to the IDFPR, the matter was "in litigation" because he filed a charge and could only be resolved through litigation. He was thus deprived of equal access to an avenue to seek a reasonable accommodation expressly because he filed an EEOC charge, itself a form of retaliation.

**G.     Constructive Discharge (2020)**

80.     In July of 2019, having lost his last hope of receiving an effective accommodation from the IDFPR and fearing for his wellbeing, Mr. Bernard began applying for other jobs.

81.     In January of 2020, due to the objectively intolerable conditions described above and IDFPR's repeated denial of reasonable accommodations, Mr. Bernard had no reasonable alternative but to leave the IDFPR for other employment.

### COUNT I: FAILURE TO ACCOMMODATE IN VIOLATION OF TITLE I OF THE ADA AND SECTION 504 OF THE REHABILITATION ACT

82.     Each of the above paragraphs setting forth the factual allegations is incorporated as if fully restated herein.

83.     Title I of the ADA and Section 504 of the Rehabilitation Act of 1973 prohibit employers from discriminating against an otherwise qualified employee with a disability by, *inter alia*, failing to make reasonable accommodations for the employee's known physical limitations. 42 U.S.C. § 12112(a); 29 C.F.R. § 1630.9(a); 29 U.S.C. § 794(d); 10 C.F.R. § 4.123(a).

84.     Plaintiff is a person with a disability under the ADA and the Rehabilitation Act because his spinal cord injury substantially limits various major life activities such as walking and standing, and major bodily functions including musculoskeletal function.

85.     Defendant is a covered entity under the ADA because it is a public employer. 42 U.S.C. § 12111(2); 29 C.F.R § 1630.2(b).

86.     Defendant is also a covered entity under the Rehabilitation Act because it receives Federal financial assistance. 29 U.S.C. § 794(a); 10 C.F.R. § 4.122(a). The Appraisal Unit of the IDFPR receives funding from The Appraisal Subcommittee (ACS) of the Federal Financial Institutions Examination Council. The ACS has provided the IDFPR with a State Support Grant that includes funds to attend conferences and trainings, contract costs for an IT project, and fees for expert witnesses.

87.     At all times relevant to this Complaint, Plaintiff was a qualified individual because he was able to perform all essential function of his position with a reasonable accommodation, as demonstrated by his years of successful employment with Defendant.

88.     Defendant knew of Plaintiff's disability and of his need for an accommodation.

89.     Plaintiff's requested accommodation of remote work in the event of severe winter weather as defined by his doctor was a reasonable accommodation. From 2014 to 2017, Plaintiff successfully performed his position with this exact accommodation.

90.     On all days that Plaintiff worked remotely, he had available work that could be performed at home. Defendant never incurred any expense or experienced any inconvenience because of Plaintiff working remotely during severe weather. Moreover, the accommodation never interfered with Plaintiff's ability to fulfill his job duties.

91.     While Plaintiff's job occasionally involved attendance at formal hearings or informal conferences, these hearings and conferences occurred infrequently. Days on which the weather was severe enough to require Plaintiff to work remotely were also infrequent. There was never a time during Plaintiff's years with the IDFPR where severe winter weather prevented him from attending or (if necessary) rescheduling without inconvenience a hearing or conference.

92.     Defendant failed to engage in a good faith interactive process with Plaintiff to determine whether his requested accommodation was reasonable.

93.     From the moment Plaintiff's supervisor first reached out to Human Resources regarding Plaintiff's need for an accommodation, Defendant indicated its unwillingness to engage in a good faith interactive process by issuing a blanket statement that remote work was never a permissible accommodation.

94.     After Plaintiff initiated the interactive process by asking for a meeting with Human Resources, ADA Coordinator Lorenzo Roberson continued to insist that remote work was never an acceptable accommodation and refused to seek out or consider any information about the essential functions of Plaintiff's position.

95.     Moreover, Defendant continually failed to follow its own procedures for evaluating an accommodation request.

96.     Defendant also failed to make a good faith effort to determine an effective alternative accommodation.

97.     Defendant discriminated against Plaintiff by, among other things:

     a.     revoking the reasonable accommodation that plaintiff had utilized successfully for years;

     b.     failing to engage in a good faith interactive process to determine if Plaintiff's requested accommodation was reasonable or to identify effective alternative accommodations;

     c.     refusing repeatedly to provide Plaintiff with the reasonable accommodation of remote work during dangerous weather as defined by Plaintiff's doctor; and

     d.     refusing to grant remote work as an accommodation during the full period of Plaintiff's recovery from surgery.

98.     Because of Defendant's unlawful actions, Plaintiff suffered injuries including but not limited to lost wages, lost benefits, and emotional distress.

## COUNT II: RETALIATION AND INTERENCE IN VIOLATION OF TITLE V OF THE ADA AND SECTION 504 OF THE REHABILITATION ACT

99.     Each of the above paragraphs is incorporated as if fully restated herein.

100.     Title V of the ADA, 42 U.S.C. § 12203, and the Rehabilitation Act prohibit employers from retaliating against or interfering with employees who engage in protected activity.

101.     Plaintiff engaged in protected activity continuously during 2018–19, when he (a) requested a reasonable accommodation to able to work remotely in severe winter weather, plus each step in the process to pursue that accommodation, including renewing his request in 2019; (b) requested remote work during recovery from his surgeries; and (c) filed an EEOC charge.

102.     Defendant subjected Plaintiff repeatedly to acts of retaliation and interference.

103.     In February 2018 and March 2018, while Plaintiff was hospitalized due to surgical complications, Defendant's employees withheld telling Plaintiff that he was required to submit new documentation to work remotely for two weeks following his hospitalization. This prevented Plaintiff from obtaining this documentation in a timely manner.

104.     In March 2018 and April 2018, Defendant's employees misinformed Plaintiff about what sort of documentation was required for him to return to work in any capacity, delaying his return to paid work.

105.     Following Plaintiff's return to work in April 2018, ADA coordinator Lorenzo Roberson berated Plaintiff without cause and inappropriately threatened him with disciplinary action in front of his coworkers on more than one occasion.

106.     In August 2018, Defendant required Plaintiff to submit post-surgery medical documentation before rendering a decision on his request to work remotely for two weeks while recovering from a second surgery. It was not Defendant's typical practice to require post-surgery documentation, and Plaintiff experienced increased stress and anxiety both before and after his surgery because of having to supply this additional documentation.

107.     When Plaintiff sought to transfer to another division within the Defendant in hopes of finding a less hostile work environment, Mr. Roberson interfered by threatening to prevent Plaintiff from receiving *any* accommodations related to severe weather if he chose to transfer.

108.    When Plaintiff renewed his request for an accommodation in 2019, he was told by Defendant that because he had a filed an EEOC charge the matter could only be handled "in litigation."

109.    Defendant retaliated against and interfered with Plaintiff in violation of the ADA and the Rehabilitation Act by, among other things:

a.    failing to accommodate Plaintiff or engage in the interactive process;

b.    misleading plaintiff about what documentation was required for his surgeries, leaves of absence, and remote work, thus frustrating his ability to return to work;

c.    requiring plaintiff to provide additional documentation not required of other employees before allowing him to return to work following surgery;

d.    subjecting him to a hostile work environment, including being removed from his office and being subjected to unwarranted threats of disciplinary action;

e.    delaying, well beyond the agency's internal procedures, a written response to Plaintiff's accommodation requests;

f.    threatening to withhold an accommodation already approved for his job to prevent plaintiff from transferring to another division within IDFPR; and

g.    refusing to consider his renewed request for accommodation in 2019 on the ground that he had filed an EEOC charge and so the matter was "in litigation."

110.    Because of Defendant's unlawful actions, Plaintiff suffered injuries including but not limited to lost wages, lost benefits, and emotional distress.

## COUNT III: CONSTRUCTIVE DISCHARGE IN VIOLATION OF THE ADA AND THE REHABILITATION ACT

111.    Each of the above paragraphs is incorporated as if fully restated herein.

112.     After requesting a reasonable accommodation under the ADA in 2018, Plaintiff was subjected to ongoing harassment, interference, and retaliation.

113.     In retaliation for and interfering with Plaintiff's attempt to exercise his rights under the ADA and the Rehabilitation Act, Defendant's employees misled Plaintiff about what documentation he needed to provide to return to work after surgery, and subjected Plaintiff to additional documentation requirements that Defendant did not impose on other employees.

114.     Because of this course of conduct, Plaintiff experienced significant stress and anxiety while preparing for and recovering from two serious surgeries.

115.     Rather than resting and recovering in the hours immediately following his second surgery, Plaintiff was forced to focus on providing additional documentation to ensure that he could return to work, potentially jeopardizing his health.

116.     Additionally, Defendant revoked the reasonable accommodation that Plaintiff had utilized successfully for years and failed to provide Plaintiff with an effective alternative.

117.     Because of Defendant's refusal to provide Plaintiff with an effective accommodation for severe winter weather, Plaintiff experienced severe anxiety and distress as he was forced to choose between suffering financial harm by taking unpaid leave or risking his safety by attempting to leave his home in dangerous weather.

118.     Plaintiff also suffered physical harm because of Defendant's refusal to provide him with a reasonable accommodation when he developed frostbite while attempting to get to the office in severe winter weather.

119.     When Plaintiff considered transferring to another division within the Defendant agency in hopes of finding a less hostile work environment, Defendant's ADA Coordinator interfered and threatened to withdraw Plaintiff accommodations if he were to transfer.

120.     The ongoing harassment, interference, and retaliation, along with the continued denial of Plaintiff's reasonable accommodation, created a work environment so objectively intolerable that any reasonable person would feel compelled to resign.

121.     In January 2020, Plaintiff involuntarily resigned his position.

122.     Defendant constructively discharged Plaintiff in violation of the ADA and the Rehabilitation Act by:

a.     subjecting plaintiff to a hostile work environment, interference, and retaliation for engaging in protected activity, as set forth above;

b.     refusing to provide plaintiff with an effective accommodation for severe winter weather, requiring Plaintiff to choose between suffering financial hardship or risking his safety; and

c.     creating a work environment so intolerable that plaintiff had no choice but to resign.

123.     Because of Defendant's unlawful actions, Plaintiff suffered injuries including but not limited to lost wages, lost benefits, and emotional distress.

WHEREFORE, Plaintiff Patrick Bernard respectfully requests that this Honorable Court:

A.     Declare Defendant's actions to violate the ADA and the Rehabilitation Act;

B.     Order Defendant to reinstate Plaintiff with all retroactive salary, promotions and seniority; or, in the alternative award Plaintiff the value of compensation and benefits he will continue to lose in the future because of Defendant's unlawful conduct;

C.     Award back pay with pre- and post-judgment interest;

D.     Award compensatory and punitive damages, or alternatively nominal damages;

E.     Award reasonable attorneys' fees and costs; and

F.     Grant such additional relief as the Court deems just and proper.

PLAINTIFF DEMANDS TRIAL BY JURY.

Dated: November 17, 2021                              RESPECTFULLY SUBMITTED,

/s/ Paul W. Mollica
One of the attorneys for Plaintiff
Paul W. Mollica (6194415)
Rachel M. Weisberg (6297116)
Equip For Equality
20 N. Michigan Ave., Suite 300
Chicago, Illinois 60602
(312) 341-0022